UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

PLANTE CONSULTING LLC,

                   *Plaintiff,*

    -against-

FORD MOTOR COMPANY,

                   *Defendant.*

-------------------------------------X

**MEMORANDUM AND ORDER**

23-CV-2475(KAM)(TAM)

**KIYO A. MATSUMOTO, United States District Judge:**

     Plaintiff Plante Consulting LLC d/b/a Premier Ford of Bay Ridge ("Bay Ridge Ford" or "Plaintiff") commenced the instant action against Ford Motor Company ("Ford" or "Defendant"), seeking declaratory relief and injunctive relief. (ECF No. 1, Complaint "Compl.").) Plaintiff alleges that Ford, by failing to provide Plaintiff with a "continuing" sales and service agreement, has violated Sections 463(2)(v), 463(2)(gg) and 466(1) of New York's Franchised Motor Vehicle Dealer Act (the "Dealer Act"), codified at New York Vehicle and Traffic Law Sections 460-473.

     Presently before the Court is Defendant's motion to dismiss the complaint, pursuant to Fed. R. Civ. P. 12(b)(1) for lack of standing. (*See* ECF No. 18, Defendant's Notice of Motion to Dismiss.) For the reasons set forth below, Defendant's motion is **GRANTED**.

1

## **BACKGROUND**

The Court accepts the allegations in the Plaintiff's complaint as true for purposes of the Motion to Dismiss. *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016). Plaintiff also submitted as part of its opposition to the motion to dismiss a copy of an October 26, 2020, letter from Ford to Bay Ridge Ford. (ECF No. 18-4, Exhibit A to Plaintiff's Declaration ("Ex. A").) Because the letter is cited extensively in the complaint, the Court may properly consider it in ruling on a motion asserting a lack of jurisdiction. *See Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations*, 136 F. Supp. 2d 257, 260 (S.D.N.Y. 2001) (noting that in situation where defendant sought dismissal on the complaint alone under Fed. R. Civ. P. 12(b)(1), court properly considered only the complaint and a document effectively incorporated into it).

## I.   **Factual Background**

Plaintiff is a limited liability company ("LLC") organized and existing under the laws of the State of New Mexico with a principal place of business in Brooklyn, New York that does business as "Bay Ridge Ford." (Compl. at ¶8; ECF No. 19, Plaintiff's Declaration in Response to the Court's Order to Show Cause.) The dealer principal of Bay Ridge Ford, a citizen of the state of New York, is the sole member of the Plaintiff LLC. (ECF No. 19.) Defendant Ford is a corporation organized under the laws

2

of the State of Delaware with its headquarters in Michigan. (Compl at ¶11.) Ford manufactures and distributes vehicles through a "network of franchised dealers throughout the United States, including Bay Ridge Ford." (*Id.* at ¶12.)

Bay Ridge Ford operates a franchised motor vehicle dealership in Brooklyn, New York, that sells and services Ford vehicles pursuant to a Sales and Service Agreement ("SSA") with manufacturer Ford. (*Id.* at ¶¶24-25; Ex. A at 1.) According to Ford's letter dated October 26, 2020, Bay Ridge Ford and Defendant entered into the operative SSA on April 19, 2018, with an initial term of two years. (Ex. A at 1.) In accordance with Ford's "current practice," a two-year term extension of the SSA was offered and executed on June 3, 2020. (*Id.* at 2.) Specifically, Ford stated in its letter dated October 26, 2020, that "after careful evaluation of [Bay Ridge Ford's] performance, [Ford] has determined you did not and currently do not satisfy the minimum requirements to earn a Continuing Agreement." (*Id.*) Ford explained in the same letter that the criteria for earning a Continuing Agreement are:

> A. Sales Effectiveness performance at 100% for Car and Truck TOTAL
> B. Sales Experience Index performance at 100% of group
> C. Service Experience Index performance at 100% of group
> D. Working Capital has been maintained at 100% of guide (9 out of 12 months)
> **PLEASE NOTE: <u>All</u> criteria must be met in order to maintain a Continuing SSA.**

(*Id.* (emphasis in original).)  According to Ford's letter, Bay Ridge Ford failed to meet the Sales Effectiveness and Service Experience Index criteria for earning a Continuing Agreement.  (*Id.* at 1.)

Sales Efficiency is "a ratio of a dealer's total sales to expected sales." (Compl. at ¶29.)  Expected sales are calculated by Ford according to a process described in the SSA, which Plaintiff argues "does not consider local market conditions and consumer preferences."  (*Id.* at ¶¶30-36.)  Ford's two customer satisfaction metrics, "Sales Experience Index" and "Service Experience Index," are calculated based on the results of surveys conducted by Ford.  (*Id.* at ¶¶48-53.)  As noted above, Ford requires dealers to achieve scores equal to or above their "Group" average.  (*Id.* at ¶54.)  Ford determines the "Group" for each dealer based on their percentage of sales within a "Region."  (*Id.* at ¶¶55-56.)  Bay Ridge Ford, which Ford has determined is in the New York Region, is in the "Medium" group, which makes up 35% of the sales in the New York Region.  (*Id.* at ¶¶56-57.)  As with the sales metrics, Bay Ridge Ford argues that "Ford's groupings fail to take into account local factors that may affect how customers score Bay Ridge Ford on customer satisfaction surveys." (*Id.* at ¶58.)  Plaintiff's complaint does not include any allegations regarding Ford's reliance on the Working Capital metric.

Plaintiff does not specify in its complaint whether its term SSA was subsequently renewed in June 2022, when the two-year extension of the SSA executed on June 3, 2020, would be due to expire. Plaintiff alleges in the Complaint that "Bay Ridge Ford and Ford are parties to the Bay Ridge Ford Dealer Agreement [SSA], which purports to authorize Bay Ridge Ford to sell and service ford vehicles" and that the agreement "is a 'term' agreement." (*Id.* at ¶¶25-26.) Defendant likewise conceded in its answer that "FORD and Plante Consulting LLC d/b/a Premier Ford of Bay Ridge are parties to a Term Ford Sales and Service Agreement ('Agreement') and that Plaintiff sells and services certain Ford brand vehicles." (ECF No. 9, Answer, at ¶25.) Given the necessity of taking all factual allegations in the complaint as true and construing all reasonable inferences in favor of the non-moving party at this stage of litigation, the Court assumes that the parties remain bound by an SSA with similar terms as laid out in the October 2020 letter. *See Carter*, 822 F.3d at 57 (discussing the Fed. R. Civ. P. 12(b)(1) standard of review).

## II. Procedural History

Plaintiff commenced the instant case on March 31, 2023. (*See generally* Compl.) After receiving an extension, Ford filed its answer on June 5, 2023, and subsequently moved for a pre-motion conference in anticipation of filing a motion to dismiss the complaint. (*See* ECF Nos. 9, 15.) The pre-motion conference was

5

held on August 4, 2023, and a briefing schedule was ordered by the Court. (*See* Docket Entry dated August 4, 2023.)  The motion to dismiss was fully briefed on October 27, 2023.  (*See* ECF No. 18, Defendant's Notice of Motion to Dismiss; ECF No. 18-1, Defendant's Memorandum of Law in Support of its Motion to Dismiss ("Def't Mem."); ECF No. 18-2, Plaintiffs' Memorandum of Law in Opposition ("Pl. Opp."); ECF No. 18-3, Plaintiffs' Declaration Annexing Exhibit A; ECF No. 18-4, Ex. A; ECF No. 18-5, Defendant's Reply Memorandum of Law in Further Support of its Motion to Dismiss ("Def't Reply").)

On October 27, 2023, this Court ordered Plaintiff to show cause why the action should not be dismissed for lack of diversity subject matter jurisdiction, based on the fact that the original complaint failed to identify the members of the Plaintiff LLC or their citizenship.  (Docket Order dated October 27, 2023.) Plaintiff subsequently submitted a declaration in response, providing information about the sole member of the Plaintiff LLC and his citizenship.  (ECF No. 19.)

## LEGAL STANDARD

### I.  Motion to Dismiss under Rule 12(b)(1)

Federal courts have inherent power under Rule 12(b)(1) to dismiss claims for which subject matter jurisdiction is lacking. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).  In considering a motion to

dismiss under Rule 12(b)(1), the "[C]ourt must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff." *Id.* (internal quotation marks and citation omitted). The Court may also "consider evidence outside the pleadings," in considering a 12(b)(1) motion. *Id.* (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

"An objection to standing is properly made on a Rule 12(b)(1) motion." *Tasini v. N.Y. Times Co.*, 184 F. Supp. 2d 350, 354-55 (S.D.N.Y. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998)). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To survive a Rule 12(b)(1) motion to dismiss, there must be facts plausibly establishing that the plaintiff has standing to sue. *Carter*, 822 F.3d at 56-57.

## **DISCUSSION**

### I.   **Standing**

#### A.   **Legal Standard**

"Federal courts are courts of limited jurisdiction that possess only that power authorized by [the] Constitution and statute." *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015) (internal quotation marks omitted). "The irreducible constitutional minimum of standing derives from Article III, Section 2 of the U.S. Constitution, which limits federal judicial

power to cases and controversies." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013), as amended (Mar. 21, 2013) (internal quotation marks and citations omitted).

To establish Article III standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (internal quotation marks and citation omitted). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), as revised (May 24, 2016). At the pleading stage, a plaintiff "bears the burden of alleging facts that affirmatively and plausibly suggest that [he or she] has standing to sue." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (internal quotation marks and citation omitted).

**B.   Analysis**

Plaintiff argues that it has suffered an injury-in-fact because Ford "has taken adverse action against Bay Ridge [Ford] based on [unlawful] metrics: Ford is withholding a continuing SSA from Bay Ridge." (Pl. Mem. at 8.) Plaintiff alleges that it is not necessary that an SSA be terminated to provide standing, citing to *Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 669 (2d Cir. 2015) ("*Beck I*") and *Beck Chevrolet Co. v. Gen. Motors LLC*, 845 F.3d 68, 70-71 (2d Cir. 2016) ("*Beck III*") among other cases[1], which the Court will address *infra*. (*Id.* at 8-9.) Defendant argues that "the Complaint, in complaining only about Ford's unwillingness to award Plaintiff a continuing SSA, rather than the term SSA [it] currently holds, does not allege any actual or potential adverse impact . . . Plaintiff has not alleged that Ford has ended, or will end, or has threatened to end, its relationship with Plaintiff based on the application of any performance standard." (Def't Mem. at 4.) Ultimately, the pending motion to dismiss turns on one question: does Ford's granting of a second time-limited SSA, as opposed to an indefinite SSA, constitute injury-in-fact for Bay Ridge Ford as required by Article III? The Court finds the answer to be in the negative, and thus Plaintiff's action must be, and is, dismissed.

---

[1] In *Beck I*, the Second Circuit certified to the New York Court of Appeals two questions regarding the scope of the Dealer Act, which the Court of Appeals answered in *Beck Chevrolet Co. v. Gen. Motors LLC*, 53 N.E.3d 706, 713 (N.Y. 2016) ("*Beck II*"). Utilizing the Court of Appeals' answer, the Second Circuit ruled on the remaining issues on appeal in *Beck III*.

As an initial matter, the Court does not find that Ford's reliance on sales and satisfaction performance standards--on its own--could constitute a concrete harm for purposes of Article III standing.  The Supreme Court has been quite clear in stating that a Plaintiff does *not* "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 578 U.S. at 341.  Plaintiff argues that Ford's implementation of sales and customer satisfaction metrics violates the Dealer Act, but Supreme Court precedent requires a "concrete injury even in the context of a statutory violation." *Id.* Nevertheless, the Supreme Court has also been clear that "the risk of real harm" may sometimes "satisfy the requirement of concreteness." *Id.* (citing *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013)).  Rather than rely on the alleged violations of the Dealer Act, the Court will instead look to whether the risk of Ford "terminating the SSA based on unlawful metrics, [] refusing to renew Bay Ridge's term SSA, or any [taking] other adverse action" is sufficient to establish Article III standing for Plaintiff's action.  (Pl. Mem. at 7.)

In *Clapper,*[2] the Supreme Court explained that, in order to establish Article III standing, an injury must be "concrete,

---

[2] Plaintiff cites to the prior Second Circuit decision, *Amnesty International USA v. Clapper*, 638 F.3d 118 (2d Cir. 2011), which was subsequently reversed by

particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." 568 U.S. at 409 (citation omitted). For future harm, the Supreme Court explained that the "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* (internal quotation marks and citations omitted). As later summarized by the Supreme Court, *Clapper* stands for the proposition that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021).

Courts in this circuit have previously construed threatened litigation as a sufficient basis for Article III standing in declaratory judgment cases. *See, e.g., Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 151 F. Supp. 3d 451, 458–59 (S.D.N.Y. 2015) ("[T]he declaratory judgment procedure would be pointless in this context if a party had to wait to be sued for infringement before seeking a declaratory judgment of non-infringement."); *see also Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 93 (2d Cir. 2023) (noting that in a "district court must find a

---

the Supreme Court, for the proposition that "standing is present where the plaintiff asserts an increased risk of future harm is injury-in-fact." (Pl. Mem. at 13-14.) The Court notes that the Second Circuit's holding is no longer applicable/controlling in light of the Supreme Court's reversal of the decision in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013).

practical likelihood that a third party will *commence* litigation against the insured" in a "duty to defend" declaratory judgment case in order to exercise jurisdiction).  Similarly, the threat of adverse action has been found sufficient in past Dealer Act cases, which the Court will consider now.

Although Plaintiff cites to *Beck I* and *Beck III* in its opposition to the motion to dismiss, the two opinions do not offer much discussion on standing, focusing instead on the substance of the Dealer Act.  The opinions are instructive, however, in determining what sort of factual circumstances warrant adjudication in federal district court.  In *Beck I,* the Second Circuit summarized the facts leading up to the pending appeal, noting that Beck Chevrolet was offered a one-year extension of its dealer agreement with further renewal dependent upon "meeting specified conditions." *Beck I*, 787 F.3d at 670.  Those conditions included meeting certain sales and customer satisfaction metrics, and the defendant-manufacturer, GM, stated that "should Dealer not meet its 2011 Performance Requirements, or should Dealer otherwise not be in compliance with its obligations under the Dealer Agreement, GM shall have no obligation to extend the Dealer Agreement beyond [the one-year period]." *Id.*  While the case was pending in district court, GM sought to terminate Beck Chevrolet's franchise agreement, and Beck Chevrolet initiated state

12

administrative court proceedings challenging the termination.  *Id.*
at 671.

*Beck I* involved an obvious threat of termination ("GM shall
have no obligation to extend the Dealer Agreement . . .") and the
opinion does not focus on Article III standing.  Certainly, the
harm was imminent (within a year, when the term agreement expired)
and substantial (non-renewal of the dealer agreement upon which
Beck Chevrolet relied).  A similar theme can be found in the other
non-binding case law cited by Plaintiff.  In *Metro Motors, LLC v.
Nissan Motor Corp. in USA*, 170 F. Supp. 2d 888 (D. Minn. 2001),
the plaintiff-dealership refused to sign an amendment to its
franchise agreement including a requirement to exclusively sell
Nissan cars, and "Nissan threatened to pursue its legal remedies,
including termination."  *Id.* at 889.  The district court found
that "Nissan's threat of termination," among other things, was
sufficient for standing purposes.  *Id.* at 891.  Likewise, *Darling's
v. Nissan North America, Inc.*, 117 F. Supp. 2d 54 (D. Me. 2000)
involved "a letter stating that the franchisor will in the future
require exclusive facilities" which the district court found could
constitute a "threat to modify the franchise."  *Id.* at 58.  *Coady
Corp. v. Toyota Motor Distributors, Inc.*, 361 F.3d 50 (1st Cir.
2004) did not involve a challenge to Article III standing, but
instead involved a contract requiring the plaintiff-dealer to
achieve "100 percent sales efficiency" or face termination,

although the contract provision had not been enforced. *Id.* at 61. The Court notes that the common thread in these cases is a "threat" to take adverse action against the Plaintiff-dealer, whether that be terminating an agreement or modifying it unilaterally.

The other case cited by Plaintiff involving an auto dealership, *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286 (3d Cir. 2005) ("*Danvers*"), is a Third Circuit decision holding that the plaintiff-dealerships adequately alleged two distinct types of harm: (1) monetary harm to achieve certification with Ford's "Blue Oval Program" which included requirements for sales and service, among other things; and (2) a loss of control over day-to-day dealership activities. *Id.* at 292-93. The monetary injuries were not speculative, and included a 1% surcharge on all vehicles sold, which was only reimbursed to dealer-plaintiffs if they met the certification requirements. *Id.* at 288, 293 n.4 (noting that, as compared to an earlier iteration of the litigation, which was dismissed without prejudice for lack of standing, the "latest version of the complaint is not speculative"); *see also Danvers Motor Co. v. Ford Motor Co.*, 186 F. Supp. 2d 530, 538 (D.N.J. 2002) (dismissing complaint without prejudice and noting that "the ongoing threat of termination" was "simply too speculative, and remote to support a finding of constitutional standing"). Similarly, the loss of control element was found to constitute injury-in-fact sounding either in "tort (loss of control over

14

dealership operations) or contract (violation of Plaintiffs' franchise agreements)." *Danvers,* 432 F.3d at 293.

In the instant case, Plaintiff cites no adverse action by Ford beyond "withholding a continuing SSA from Bay Ridge [Ford]." (Pl. Mem. at 8.)  Plaintiff offers no facts supporting a "loss of control" theory or facts alleging monetary damages as noted in *Danvers.*  Plaintiff also fails to allege any particular threat of harm by Ford, as alleged in the other cases Plaintiff cites, as discussed *supra*.  Quite the contrary, Ford stated in its October 26, 2020, letter that "[i]t is our current practice to offer Term Sales and Service Agreements to underperforming dealerships" and accordingly, Bay Ridge Ford's term agreement was extended for another two-year term despite Plaintiff's failure to meet the "Standard Performance Metrics" set out in the SSA.  (Ex. A at 1-2.)  Plaintiff points to no threat of non-renewal or termination in Ford's letter, and the Court does not find any on its own review.  In the absence of any true threat, the Court does not find a "risk of harm [that] is sufficiently imminent and substantial." *TransUnion LLC*, 594 U.S. at 435.

The absence of any concrete harm, much less an imminent harm, can also be found elsewhere in the complaint.  Plaintiff states that it is not required to "operate with the 'sword of Damocles' hanging over" it but fails to offer any explanation as to *why* it waited until March 31, 2023, to bring its complaint against Ford

based on statements made in an October 26, 2020, letter.  (Pl.
Mem. at 13.)  This is in stark contrast to *Beck I,* in which the
dealership was threatened with non-renewal if it did not meet
performance standards within a year.  *Beck I*, 787 F.3d at 670.
Nothing in the complaint suggests that harmful action by Ford is
"sufficiently imminent," a point which is further underscored by
the fact that Ford presumably renewed the Term SSA for a further
period in 2022, as the parties both are in agreeance that there is
currently an operative SSA between Bay Ridge Ford and Ford.  (ECF
No. 9, Answer, at ¶25.)  In the absence of some additional factual
developments between October 26, 2020, that amount to an actual or
imminent threat of non-renewal or other adverse action, the Court
finds that Plaintiff has failed to satisfy the concrete injury
requirements of Article III.

Notwithstanding the above, the Court agrees with Plaintiff
that there is certainly a "distinction between the continuing and
term SSAs"--if there were no distinction, one would imagine that
Ford would simply provide a continuing SSA to all dealers.  (Pl.
Mem. at 14.)  Defendant correctly notes that the Dealer Act does
not distinguish between term and continuing SSAs, but Defendant
certainly see some difference between the two, given it utilizes
a continuing SSA as an incentive for dealerships which meet
performance metrics.  (Def't Reply at 3.)  Nevertheless, the fact
that Defendant distinguishes between the two types of agreements

16

does not establish that being provided a term SSA constitutes a concrete injury for purposes of Article III standing. Plaintiff fails to point to *any* difference in the two types of agreements beyond their duration. Presented with an indefinite SSA and a two-year term SSA without any apparent conditions surrounding renewal, the Court simply does not find a meaningful distinction for purposes of the Article III standing analysis. For this reason, and the reasons stated above, the Court finds that Plaintiff has failed to plead a concrete injury, and thus lacks standing to pursue this action in federal district court.

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the complaint is **granted** in its entirety. This Court lacks subject matter jurisdiction to hear Plaintiffs' claims, which are dismissed without prejudice.

Fed. R. Civ. P. 15(a) provides that leave to amend a complaint shall be freely given "when justice so requires." The Second Circuit has advised that "it is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (citing *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). Accordingly, the Court will consider granting leave to amend the complaint if Plaintiff moves to do so by May 3, 2024, and appends a proposed Amended Complaint that addresses the factual

deficiencies discussed in this Memorandum and Order regarding the lack of concrete injury. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.")  If Plaintiff moves to amend, it shall consider whether a jury demand is appropriate given the nature of the relief it will seek.  The parties shall meet and confer and jointly advise the Court on the docket, no later than April 19, 2024, how they intend to proceed.

**SO ORDERED**

Dated:      April 10, 2024
            Brooklyn, New York

            _____
            **HON. KIYO A. MATSUMOTO**
            United States District Judge
            Eastern District of New York